UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ADAM BRADSTREET,

                         Plaintiff,

        v.

CITY OF ROCHESTER, ROCHESTER
POLICE DEPARTMENT, ROCHESTER
POLICE LOCUST CLUB, INC.,

                   Defendants.
_____

**DECISION AND ORDER**

6:23-CV-06147 EAW

## INTRODUCTION

Plaintiff Adam Bradstreet ("Plaintiff") brings this action against defendants the City of Rochester ("City"), the Rochester Police Department ("RPD"), and the Rochester Police Locust Club, Inc. (the "Locust Club") (collectively "Defendants"), relating to his former employment as an RPD officer. (Dkt. 16). Plaintiff asserts claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), the Due Process Clause of the Fourteenth Amendment, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"), New York Civil Service Law § 75-b, and for breach of contract, breach of duty of fair representation, constructive termination or discharge, abuse of process, fraudulent misrepresentation, and conversion. (*Id.*)

Presently before the Court are two motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), one filed by the Locust Club (Dkt. 22) and the other filed by the

- 1 -

City (Dkt. 26).[1]  For the reasons that follow, the Locust Club's motion to dismiss (Dkt. 22) is granted.  The City's motion to dismiss (Dkt. 26) is granted in part and denied in part. Specifically, the City's motion is granted with respect to Plaintiff's conversion claim.  The City's motion is denied as to the other claims asserted against it.

## FACTUAL BACKGROUND

The following facts are taken from Plaintiff's second amended complaint, which is the operative pleading.  (Dkt. 16).  As required at this stage of the proceedings, Plaintiff's factual allegations are treated as true.

Plaintiff served as an RPD officer from 2016 to 2021, and he was a member of the Locust Club, a police union.  (*Id.* at ¶¶ 5, 10, 64).  He completed the "Basic Course for Police Officers or Equivalent" and received multiple accolades, including the "Excellent Police Service Award," "Officer of the Month," two letters of recognition from the chief of the department, and a "Unit Commendation Award."  (*Id.* at ¶¶ 12-15, 21).  Prior to joining RPD, he was a police officer in Philadelphia.  (*Id.* at ¶¶ 7, 10).

In October 2020, Plaintiff raised concerns that identified RPD officers were engaging in misconduct and violating "the Penal Law."  (*Id.* at ¶ 16).  Unspecified

---

[1]     The City correctly argues that RPD is a department of the City and therefore lacks the capacity to sue or be sued.  (*See* Dkt. 26-1 at ¶ 9).  Under New York law, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence."  *Rodgers v. Rensselaer Cnty. Sheriff's Dep't*, No. 1:14-CV-01162 (MAD/TWD), 2015 WL 4404788, at *5 (N.D.N.Y. July 17, 2015) (quoting *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999)); *see also* Fed. R. Civ. P. 17(b)(3).  RPD is accordingly terminated as a defendant.

individuals told Plaintiff to "keep his mouth shut" and to avoid spreading rumors.  (*Id.* at ¶ 16).

On October 5, 2020, Plaintiff suffered domestic violence when his then-girlfriend harassed and bit him.  (*Id.* at ¶ 17).  As a result, RPD initiated a "Professional Standards Section" ("PSS") investigation and issued an order requiring Plaintiff to stay away from his then-girlfriend.  (*Id.* at ¶¶ 17-18).  Unidentified RPD employees "disclosed the Domestic Incident Report and [Plaintiff's] name to uninvolved parties in violation of NYS law, their training, policies and procedures."  (*Id*. at ¶ 19).  When Plaintiff objected to this unauthorized disclosure, he "was treated differently for having spoken out[.]"  (*Id*. at ¶ 20).

On or about January 30, 2021, Plaintiff responded to an incident on Harris Street in the City that became the subject of international news reporting.  (*Id.* at ¶ 22).  Plaintiff requested that an officer be assigned to his home, "as he had received threats, with an aerial photo of his home."  (*Id*. at ¶ 23).  His request was denied.  (*Id*. at ¶ 24).

Plaintiff alleges that RPD engaged in a "pattern of discrimination against him from the initial complaints of domestic violence discrimination."  (*See id.* at ¶¶ 25-38).  On February 2, 2021, RPD placed Plaintiff on "Q time,"[2] and eight days later, it reassigned him to a different unit, away from the unit where he preferred to work.  (*Id.* at ¶¶ 25-26).

Also in February of 2021, the PSS investigation into Plaintiff's incident with his then-girlfriend concluded.  (*Id.* at ¶ 27).  The sergeant who conducted the investigation found the allegation against Plaintiff to be "unproveable," but one lieutenant and RPD

---

[2]     The second amended complaint does not explain what "Q time" is or why it is an adverse action.

executive deputy chief recommended that he be terminated.  (*Id.* at ¶¶ 27, 29).  A different sergeant and another lieutenant recommended that Plaintiff be suspended for one month and two months, respectively.  (*Id.* at ¶ 28).

On March 30, 2021, Plaintiff made another report to RPD internal affairs that identified RPD officers were engaging in misconduct.  (*Id.* at ¶ 31).  That day, agents from the City and RPD gave Plaintiff "a packet of disciplinary charges" and requested that he turn in his service gun, but they did not confiscate his badge and identification cards or suspend him.  (*Id.* at ¶ 32).  Plaintiff was also given notice of a hearing scheduled for the following month.  (*Id.* at ¶ 33).  On April 13, 2021, the City and RPD "'preferred' the March 30, 2021 charges against [Plaintiff]."  (*Id.* at ¶ 35).  The RPD interim chief recommended Plaintiff's termination but also appointed a hearing officer for the PSS investigation.  (*Id.* at ¶ 38).

 Throughout this process, the Locust Club did not provide Plaintiff with a lawyer. (*Id.* at ¶¶ 37, 41).  On April 30, 2021, Michael Mazzeo, the Locust Club President and an RPD employee, texted Plaintiff:

> Brad, feel free to go out and tell everyone I hung up because you hurt my feelings.  I have almost 700 members to take care of.  I don't have time to go over and over someone who can't listen to what they are being told…My success and my reputation speaks for me.  I know what I am doing and you feel different, that does not bother me.  I am not going to waste hours talking to you to try to convince you That I know what I am doing.

(*Id.* at ¶ 39).  On May 5, 2021, Mazzeo told Plaintiff that he had an upcoming meeting with the RPD chief about Plaintiff and that while Plaintiff was entitled to an attorney through

the Locust Club, the union could not provide one until the matter came before a finance committee.  (*See id.* at ¶¶ 40-41).

In a meeting with Mazzeo, the union's attorney, and unspecified other individuals on June 29, 2021, Plaintiff said that he was being treated unfairly compared to other RPD employees facing disciplinary action and criminal accusations.  (*Id.* at ¶ 42).  This included a black female RPD officer accused of domestic menacing with a gun, a Hispanic RPD male officer accused of menacing with a gun, and a Hispanic female RPD officer accused of participating in illegal drug deals.  (*Id.*).  Plaintiff, a white male, stated during the meeting that he faced significantly more scrutiny even though the accusations against him were less severe.  (*See id.*).  Whereas he was "ultimately forced to resign and constructively terminated," the black female officer and the Hispanic male officer were not terminated, and the Hispanic female officer was not terminated until she committed another offense.  (*See id.* at ¶¶ 43-46).  Plaintiff also was "similarly discriminated against in comparison to" a former RPD deputy chief who was rumored to have impregnated a minor.  (*Id.* at ¶ 48).

Plaintiff received a voicemail from Mazzeo on July 3, 2021, in which Mazzeo said that Plaintiff was "driving everybody nuts" and that "[o]ne person is responsible for this and that's you, you don't wanna accept it, I'll help you any way I can, but I'm not about to have my people or me listen to your CRAP!"  (*Id.* at ¶ 49).  Plaintiff also texted Adam Devincentis, an RPD sergeant, to address the discrimination he was facing, and Devincentis responded, in part, "I am not at your beckon [sic] call so fuck off!"  (*Id.*).

On August 12, 2021, Plaintiff was exonerated of all disciplinary charges involving the incident on Harris Street in January 2021.  (*See id.* at ¶ 53).  His civil service

disciplinary hearing was scheduled for August 23, 2021, and beforehand, Mazzeo told Plaintiff that his only option was resignation because if the hearing began, resignation would be "off the table" and the hearing would become a termination hearing. (*Id.* at ¶ 54). No lawyer was provided to Plaintiff. (*Id.*). Mazzeo told Plaintiff that he was being offered a "tentative resignation" and that he would remain on "Q time," and when the current RPD chief left, "negotiations would continue and [Plaintiff] could continue working at RPD." (*Id.* at ¶ 55).

Plaintiff was called to the Locust Club headquarters on September 14, 2021, and Devincentis presented Plaintiff with papers and instructed that he sign them. (*Id.* ¶¶ 56-57). When Plaintiff asked that a union attorney review the papers with him, Devincentis told Plaintiff that "it was a done deal" and that if he did not sign, he would be immediately terminated. (*Id.* at ¶¶ 57-58). According to the second amended complaint, "[Plaintiff], under duress and the previous understanding of Mazzeo signed the papers that constructively terminated him but under the guise of resignation and further with terms never negotiated or explained to him, no ability to prepare for a hearing." (*Id.* at ¶ 59). The signed papers were an agreement between Plaintiff and the City in which Plaintiff purportedly agreed, among other terms, to waive legal claims against the City and voluntarily separate from his position with RPD on or before December 6, 2021, in exchange for resolving disciplinary charges and avoiding termination ("the Settlement Agreement"). (*See* Dkt. 21-3 at 2-4). The Settlement Agreement provides the following in relevant part:

By entering into this Agreement, Officer Bradstreet acknowledges and agrees that he hereby unconditionally releases and forever discharges the City of Rochester and the Rochester Police Department from any and all claims, demands, causes of action, fees and liabilities of any kind whatsoever, whether known or unknown, which Officer Bradstreet ever had, now has, or may hereafter have against the City of Rochester and the Rochester Police Department. . . .

The Parties acknowledge and agree that no promise or inducement has been offered to them for signing this Agreement other than the promises contained herein.   Parties further acknowledge that they have entered into this Agreement knowingly and voluntarily and have had an opportunity to consult with their respective counsel prior to signing this Agreement. . . .

In the event Officer Bradstreet shall fail to voluntarily resign from the Rochester Police Department by 5:00 p.m. on December 6, 2021, the City of Rochester is authorized and permitted to immediately terminate Officer Bradstreet. . . .

Officer Bradstreet stipulates that he had sufficient and ample opportunity to consult legal counsel regarding any question he may have had regarding the meaning and effect of this Agreement.   If Officer Bradstreet had any questions, they have been answered to his satisfaction and he is willingly and knowingly executing and entering into this Agreement.   Officer Bradstreet, therefore, waives any defense to the enforceability or effectiveness of this Agreement on such basis.   Officer Bradstreet agrees that he had equal opportunity to negotiate the terms of this Agreement and stipulates that he is an equal drafter . . . .

This Agreement embodies the entire understanding of the Parties and replaces and supersedes any prior representations, whether written or oral, implied or express, concerning the subject matter hereof.

(*Id.* at 2-3).

After the new RPD chief took over in November 2021, Mazzeo told Plaintiff that he would not assist Plaintiff in reaching out to the new chief.  (*See* Dkt. 16 at ¶ 60).  Mazzeo texted Plaintiff that he would not defend Plaintiff by "showcasing another member's past." (*Id.* at ¶ 61).  Mazzeo texted Plaintiff on November 24, 2021, stating that RPD was not willing to change its position and that the Locust Club was "trying to negotiate Q time and

tentative resignation until we can negotiate with the next chief – the day they are there for the hearing." (*Id.* at ¶ 62).

Plaintiff resigned from RPD on December 1, 2021, and his last day was five days later. (*Id.* at ¶¶ 63-64). Defendants "took steps to make sure that he never worked as, not only a RPD Officer, but a police officer in general." (*Id.* at ¶ 140). Police recruitment officers told Plaintiff that they would not consider him for employment because of his litigation with the RPD. (*See id.*).

On February 14, 2022, Plaintiff contacted the City's Office of Public Integrity to complain about retaliation and unfair treatment that he had experienced. (*See id.* at ¶ 65). Plaintiff filed a complaint with the New York State Division of Human Rights on April 8, 2022. (*Id.* at ¶ 66). Four days later, the RPD chief sent a letter to Monroe County Court asking that it revoke Plaintiff's pistol permit, even though Plaintiff had never been convicted of a felony, misdemeanor, or subject to a mental hygiene arrest. (*Id.* at ¶¶ 67, 136). Plaintiff participated in multiple hearings on the revocation of his pistol permit, and an RPD lieutenant testified at one hearing on behalf of the RPD chief, after which the Monroe County Court revoked the permit. (*See id.* at ¶¶ 71, 73, 75).

On June 15, 2022, the City's Corporation Counsel demanded that Plaintiff withdraw his complaint to the Division of Human Rights within seven days. (*Id.* at ¶ 72). The following month, Plaintiff emailed the City's Office of Public Integrity about the loss of his pistol permit. (*Id.* at ¶ 76). On September 28, 2022, the Division of Human Rights issued a "Determination and Order finding no probable cause." (*Id.* at ¶ 77). Plaintiff filed suit in both the Monroe County Supreme Court and the New York State Appellate Division,

Fourth Department, challenging the revocation of his pistol permit, the latter of which upheld the Monroe County Court's decision to revoke the permit. (*Id.* at ¶¶ 78, 83). On November 30, 2022, the U.S. Equal Employment Opportunity Commission issued a right to sue letter. (*See id.* at ¶ 79). Plaintiff sent a letter to the City requesting reinstatement to RPD, to which the City responded on December 22, 2022, stating that the RPD chief declined his request. (*Id.* at ¶¶ 80-81).

Plaintiff's second amended complaint asserts the following claims against Defendants: (1) unlawful discrimination based on his status as a victim of domestic violence pursuant to the NYSHRL; (2) unlawful discrimination based on sex and race pursuant to Title VII;[3] (3) violation of due process under the Fourteenth Amendment and breach of contract; (4) retaliatory action by a public employee pursuant to New York Civil Service Law § 75-b; (5) breach of the duty of fair representation; (6) constructive termination or discharge; (7) abuse of process; (8) fraudulent misrepresentation; and (9) conversion. (*Id.* at ¶¶ 94-145).

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action on March 6, 2023 (Dkt. 1), filed an amended complaint on May 25, 2023 (Dkt. 3) ("first amended complaint"), and filed a second amended complaint on August 4, 2023 (Dkt. 16) ("second amended complaint"). The

---

[3]      Under his Title VII cause of action, Plaintiff refers to a section of the New York Codes, Rules and Regulations, "4 NYCRR § 5.4," seemingly to suggest that he may be entitled to be reinstated to RPD, but he does not explicitly allege so. (*See* Dkt. 16 at ¶ 105). As such, the Court does not interpret the second amended complaint to be raising a violation of this regulation as an independent cause of action.

Locust Club (Dkt. 22) and the City (Dkt. 26) each filed the instant motions to dismiss.[4]
Plaintiff filed responses in opposition to the motions to dismiss by the City (Dkt. 32) and
the Locust Club (Dkt. 33).  The Locust Club (Dkt. 34) and the City (Dkt. 35) completed
the briefing by filing replies in further support of their respective motions to dismiss.

## DISCUSSION

### I.    Legal Standard—Rule 12(b)(6)

A court should consider a motion to dismiss for failure to state a claim by "accepting
all factual allegations as true and drawing all reasonable inferences in favor of the
plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566
(2d Cir. 2016).  To withstand dismissal, a claimant must set forth "enough facts to state a
claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570
(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows
the court to draw the reasonable inference that the defendant is liable for the misconduct
alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
detailed factual allegations, a plaintiff's obligation to provide the grounds of his
entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation

---

[4]      In its motion, the City made a cursory argument in the alternative for summary
judgment.  (*See* Dkt. 26 at 1).  However, the City has not cross-moved for summary
judgment nor satisfied any of the procedural prerequisites for seeking such relief.  As such,
any request is summarily denied.

of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

## II.     The Locust Club's Motion to Dismiss

The Court begins by evaluating the Locust Club's motion to dismiss. (Dkt. 22). The Locust Club interprets the second amended complaint as alleging the third (breach of contract and violation of due process), fifth (breach of duty of fair representation), sixth (constructive termination or discharge), and eighth (fraudulent misrepresentation) causes of action against it, and it also addresses the ninth (conversion) cause of action to the extent it is alleged against the Locust Club. (Dkt. 21-5 at 5). Plaintiff responds that in addition to the five causes of action that the Locust Club addressed in its motion to dismiss, the seventh cause of action (abuse of process) is also alleged against the Locust Club, (Dkt. 33 at 3), which the Locust Club contests (Dkt. 34 at 9-10).

### A.     Third Cause of Action: Breach of Contract and Violation of Due Process

The Court begins with Plaintiff's claim that he was under contract with all defendants, including the Locust Club, while employed as a police officer, and quotation from an unidentified contract that the Locust Club allegedly violated. (*See* Dkt. 16 at ¶¶ 108, 111-13). Plaintiff also alleges that "[t]he law implies in every union contract fundamental requirements of due process." (*Id.* at ¶ 115).

As to the breach of contract claim, the Locust Club argues: (1) Plaintiff does not allege that he was a party to a contract with the Locust Club; (2) Plaintiff does not allege any acts by the Locust Club in violation of its obligations under the collective bargaining agreement ("CBA") with the City; and (3) any violations of the CBA by the Locust Club are time barred. (*See* Dkt. 21-5 at 6-7). The Locust Club further argues that Plaintiff cannot allege a constitutional due process claim against it as a non-government actor. (*See id.* at 5-6).

"Under New York law, a union member has no cause of action against his union for breach of a collective bargaining agreement between his employer and his union." *Felton v. Monroe Cmty. Coll.*, 579 F. Supp. 3d 400, 415-16 (W.D.N.Y. 2022) (quoting *Ifill v. N.Y.S. Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009); *see also Herington v. Civil Serv. Emps. Ass'n, Inc.,* 130 A.D.2d 961, 962 (4th Dept. 1987) ("plaintiff has no cause of action against his union either for breach of contract or for negligence arising out of the performance of duties assumed under the collective bargaining agreement"). Rather, "his sole remedy is an action for breach of fair representation." *Herington*, 130 A.D.2d at 378. An exception to this rule may be found where the union member can "point to language in the collective-bargaining agreement specifically indicating an intent to create obligations enforceable against the union by the individual employees." *Staten v. Patrolmen's Benevolent Ass'n of City of N.Y., Inc.*, 736 F. App'x 17, 17 (2d Cir. 2018) (citation omitted); *see also Argento v. Airborne Freight Corp.*, 933 F. Supp. 373, 376 (S.D.N.Y. 1996) ("Only the union and the employer . . . are signatories to the collective-bargaining agreement. An employee claiming that a union owes him an additional duty

under the collective-bargaining agreement must be able to point to language in the agreement specifically indicating an intent to create obligations enforceable against the union by the individual employees." (quotation omitted)).

Plaintiff does not identify the alleged contract with the Locust Club from which he quotes in the second amended complaint, but he acknowledges in his response to the Locust Club's motion that he is referring to the CBA between the City and the Locust Club.  (*See* Dkt. 33 at 2).[5]  Plaintiff does not cite to any language in the CBA demonstrating an intent to create an obligation enforceable against the union by an individual employee.  Instead, Plaintiff argues that the CBA imposes requirements or prohibitions on the Locust Club vis-a-vis Plaintiff because "the Police Department consists, mostly, of members of the Locust Club who act on behalf of both[.]"  (Dkt. 33 at 2).  This argument plainly fails to satisfy the applicable standard.  Accordingly, Plaintiff's breach of contract claim against the Locust Club is dismissed.  *See Cantrell v. Igie*, No. 16-cv-00903 (JGK), 2016 WL 7168220, at *7 (S.D.N.Y. Dec. 8, 2016) (dismissing breach of contract claim against union when plaintiff failed to present evidence that a CBA created obligations on the union to individual employees); *Pilchman v. Am. Fed'n of State, Cnty. & Mun. Emps.*, No. 10 CV 4976

---

[5]      Given Plaintiff's acknowledgement, the CBA can be considered for the instant motion as a document incorporated by reference in the second amended complaint.  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider . . . documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  "A document is incorporated by reference if the complaint makes, 'a clear, definite and substantial reference to the document.'"  *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017) (quotations and citation omitted).

(KMW), 2011 WL 4526455, at *14 (S.D.N.Y. Sept. 29, 2011) (dismissing breach of contract claim against union when plaintiff failed to identify relevant language in CBA conferring on employees an ability to enforce the union's obligations).[6]

As to Plaintiff's invocation of his right to due process, "[b]ecause the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) (citation omitted). "Labor unions . . . generally are not state actors[.]" *Id.*; *see also Peralta v. 32BJ SEIU*, No. 21-1638, 2022 WL 792164, at *1 (2d Cir. March 16, 2022) (affirming district court's dismissal of constitutional claim when plaintiff failed to allege any facts suggesting defendant labor union should be treated as a state actor). However, "a private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." *Ciambriello*, 292 F.3d at 324 (quotation omitted). "The 'touchstone of joint action is often a plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the State.'" *Kumpf v. N.Y. State United Tchrs.*, 642 F. Supp. 3d 294, 309 (N.D.N.Y. 2022) (quoting *Forbes v. City of N.Y.*, No. 05 Civ. 7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008)).

"[A] collective bargaining agreement <u>may</u> be the source of a property right entitled to due process protection." *Henneberger v. Cnty. of Nassau*, 465 F. Supp. 176, 192 (E.D.N.Y. 2006) (emphasis added). However, "not every contractual benefit rises to the

---

[6]     Due to these pleading deficiencies, the Court need not reach the Locust Club's statute of limitations argument as to Plaintiff's breach of contract claim.

level of a constitutionally protected property interest." *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991). Because Plaintiff has not plausibly alleged that the Locust Club deprived him of a contractual benefit rising to the level of a constitutionally protected property interest, he has not alleged a viable due process claim against it.[7]

Plaintiff also has not alleged that the Locust Club is a state actor, nor has he plausibly alleged that the Locust Club was "a willful participant in joint activity" with the City or its agents with respect to any alleged due process violation. *See Ciambriello*, 292 F.3d at 324 (affirming that plaintiff's allegations that union officials conspired with government officials were conclusory and lacked specificity); *Gleason v. Scoppetta*, 566 F. App'x 65, 69-70 (2d Cir. 2014) (affirming that union was not acting under color of state law when complaint made allegations against individuals who were both city officials and union board members). Plaintiff points to no plausible plan, prearrangement, conspiracy, custom or policy that the City and the Locust Club shared, and his argument that Locust Club members act on behalf of the City because they are members of RPD falls far short of alleging that the Locust Club is a state actor. His allegations of collusion between the

---

[7]     Additionally, Plaintiff has not alleged that he made use of the CBA's grievance procedures, or that the CBA's grievance procedures were in some manner inadequate. *See Hefferan v. Corda*, 498 F. App'x 86, 88 (2d Cir. 2012) ("Hefferan argues that the union's breach of its duty of fair representation excused him from any exhaustion obligation. Strictly speaking, what is at issue is not exhaustion, . . . but the failure of the plaintiff to make use of an adequate post-deprivation remedy such as a grievance hearing. We have held that such failure will defeat a procedural due process claim on the merits, even if the post-deprivation remedy is no longer available at the time of suit. . . . ").

Locust Club and the City are entirely conclusory.  Therefore, any due process violation claim alleged against the Locust Club is dismissed.

### B.      Fifth Cause of Action: Breach of Duty of Fair Representation

The Court turns to Plaintiff's claim that the Locust Club breached the duty of fair representation through conduct that was arbitrary, in bad faith, dishonest, and intentionally and severely discriminatory, including by refusing to provide him with an attorney and colluding with the City to induce Plaintiff to resign under false pretenses.  (*See* Dkt. 16 at ¶¶ 127-29).  The Locust Club argues that Plaintiff's breach of fair representation claim is time barred.  (Dkt. 21-5 at 8-9).

"Under New York state law, a claim against a union for violating the duty of fair representation is subject to a four-month statute of limitations."  *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing N.Y. C.P.L.R. 217(2)(a)).  The four-month statute of limitations begins when "the employee or former employee knew or should have known that the breach has occurred, or within four months of the date the employee or former employee suffers actual harm, whichever is later."  N.Y. C.P.L.R. 217(2)(a); *see D'Antonio v. Metro. Transp. Auth.*, No. 06 Civ. 4283(KMW), 2010 WL 1257349, at * 5 (S.D.N.Y. Mar. 31, 2010) ("Pursuant to Section 217 of the CPLR, a claim for breach of duty of fair representation must be brought within four months of (1) the date the employee knew or should have known that the breach occurred; or (2) the date the employee suffered actual harm, whichever is later.") (citing *Schermerhorn v. Metro. Transp. Auth.*, 156 F.3d 351, 353 (2d Cir. 1998)).

The Locust Club contends that Plaintiff's cause of action accrued on December 6, 2021, the date Plaintiff alleges that his employment with the City ended.  (*See* Dkt. 21-5 at 8).  Plaintiff argues that his cause of action against the Locust Club did not accrue until December 22, 2022, when the RPD chief declined to reinstate him, and that his action was timely because he filed the instant action 74 days later.[8]  (*See* Dkt. 16 at ¶ 81; Dkt. 33 at 2).  Plaintiff's argument is without merit.  An employee's request to his employer to reinstate him "does not toll or revive the Statute of Limitations" under § 217.  *Majer v. Metro. Transp. Auth.*, No. 90 Civ. 4608 (LLS), 1990 WL 212928, at *9 (S.D.N.Y. Dec. 14, 1990) (quoting *Lubin v. Bd. of Educ. of City of N.Y.*, 60 N.Y.2d 974, 976 (1983)).

The Court finds that Plaintiff's claim accrued when his employment with the City ended on December 6, 2021, because he suffered actual harm on that date.  *See Ifill*, 655 F. Supp. 2d at 394 ("[T]he date on which [the plaintiff] knew or should have known that the [union] allegedly breached its duty of fair representation is the same date on which he suffered actual harm . . . the date he was allegedly forced to resign.").  Plaintiff cannot plausibly argue that he did not know that the Locust Club had breached its duty of fair representation until after December 6, 2021, because Plaintiff has not alleged any actions by the Locust Club after this date that give rise to a claim for breach of the duty of fair

---

[8]      The Locust Club was not named as a defendant in this action until the first amended complaint was filed on May 25, 2023, or 154 days after Plaintiff's reinstatement request was denied.  (*See* Dkt. 1; Dkt. 3).  Obviously, this timeframe is more than four months.  In arguing that this cause of action is timely, Plaintiff does not address why his claim against the Locust Club relates back to the date of his original pleading on March 6, 2023, pursuant to Federal Rule of Civil Procedure 15(c).  The Locust Club also does not make an argument that the first amended complaint does not relate back.  Because the parties have not raised this issue, the Court does not address it further.

representation.  Indeed, the last reference in the second amended complaint to a specific action by the Locust Club is to a text message that Mazzeo sent Plaintiff on November 21, 2021, indicating that the Locust Club was still trying to negotiate but that the City was not "budging."  (Dkt. 16 at ¶¶ 61-62).

By the date that Plaintiff resigned from his employment, as alleged, the Locust Club had allegedly repeatedly refused his requests to provide him with an attorney, and he had received multiple contentious communications from Locust Club members.  (*See id.* at ¶¶ 39-41, 49, 54-59).  To the extent that Plaintiff alleges such conduct gave rise to his breach of duty of fair representation claim, which he seemingly does, then Plaintiff's cause of action had accrued by December 6, 2021.  Since Plaintiff does not allege that he sought the Locust Club's assistance in negotiating his return to RPD after his employment ended on December 6, 2021, he cannot plausibly claim that the Locust Club breached its duty after that date.  *See Jackson v. N.Y.C. Transit*, No. 05-CV-1763 (FBLB), 2005 WL 2664527, at *3 (E.D.N.Y. Oct. 19, 2005) ("The latest activity alleged in the complaint that involved [the union] occurred on . . . the date [plaintiff] learned that [the union] would not file a grievance on his behalf; accordingly, [plaintiff's duty of fair representation] claim started to accrue on that date.").  Accordingly, Plaintiff's claim that the Locust Club breached a duty of fair representation is time barred and must be dismissed.

### C.  Sixth Cause of Action: Constructive Termination or Discharge

Plaintiff's next cause of action against the Locust Club is for constructive termination or discharge for recommending Plaintiff's termination from RPD before he had an opportunity to be heard, tricking him into resigning, refusing to provide him with an

attorney, and seeking to revoke his right to possess a firearm.  (*See* Dkt. 16 at ¶¶ 131-33).

The Locust Club argues: (1) Plaintiff can only assert this cause of action against his

employer; and (2) Plaintiff has not alleged any Locust Club conduct that adversely affected

his working conditions.  (Dkt. 21-5 at 9).[9]

"Constructive discharge of an employee occurs when an *employer*, rather than

directly discharging an individual, intentionally creates an intolerable work atmosphere

that forces an employee to quit involuntarily."  *Serricchio v. Wachovia Sec. LLC*, 658 F.3d

169, 185 (2d Cir. 2011) (emphasis added); *see also Nelson v. HSBC Bank USA*, 41 A.D.3d

445, 447 (2d Dep't 2007) ("In order to maintain a cause of action for constructive

discharge, a plaintiff must show that his or her employer deliberately made working

conditions so intolerable that he or she was forced into involuntary resignation.").  The

Locust Club was not Plaintiff's employer, and he cannot overcome this fatal defect by

merely asserting that the union "and its members as described in the Complaint participated

in and assisted the City" in constructively terminating or discharging him.  (*See* Dkt. 33 at

3).  Plaintiff's claim against the union plainly fails on this basis.  *See Cooper v. Wyeth*

*Ayerst Lederle*, 106 F. Supp. 2d 479, 501 (S.D.N.Y. 2000) ("[T]he Union was not

[plaintiff's] employer.  It cannot discharge an employee.").  Furthermore, the alleged

conduct by the Locust Club that Plaintiff cites under this cause of action does not even

---

[9]     The Locust Club also argues that "the gravamen of the complaint" against the
Locust Club is for a breach of the fair duty of representation and that he cannot re-
characterize his causes of action to avoid the statute of limitations for his primary claim.
(*See* Dkt. 21-5 at 10).  While the Court agrees, it need not address this argument in any
detail because Plaintiff's pleading is otherwise insufficient.

pertain to his work conditions, and he offers nothing more than a conclusory statement that a reasonable person would have felt compelled to resign because of the difficult and unpleasant working conditions. (*See* Dkt. 16 at ¶ 132). He further immediately contradicts that allegation by stating that he "did not want to resign." (*Id*. at ¶ 133). Accordingly, Plaintiff's claim for constructive termination or discharge against the Locust Club is not plausibly alleged and is dismissed.

### D.    Seventh Cause of Action: Abuse of Process

The Locust Club's motion to dismiss did not initially address Plaintiff's cause of action for abuse of process because the second amended complaint did not include any allegations against the Locust Club for this claim. (Dkt. 34 at 9). Plaintiff contends in his opposition to the motion to dismiss that the Locust Club is included in this claim. (Dkt. 33 at 5). The allegations of the abuse of process claim state, in their entirety:

> 134.  Plaintiff repeats, reiterates and realleges the preceding paragraphs as if more fully set forth herein.

> 135.  An abuse of process involves regularly issued process, either civil or criminal, an intent to do harm without excuse of justification and the use of process in a perverted manner to obtain a collateral objective.

> 136.  RPD and CITY received the discrimination complaint of Plaintiff and four days later sought a hearing in Monroe County Court to revoke his permit to carry any firearms with the collateral objective of preventing him from gaining new employment as a police officer.

(Dkt. 16 at ¶¶ 134-36). Plaintiff cannot assert that these allegations somehow apply to the Locust Club. *See V.E.C. Corp. of Del. v. Hilliard*, No. 10 CV 2542 (VB), 2011 WL 7101236, at *12 (S.D.N.Y. Dec. 13, 2011) (finding cause of action was not raised against defendants not mentioned in the allegations, and therefore, there was no claim to dismiss

against those defendants).  The Court agrees with the Locust Club that "plaintiff's assertion that this cause of action is somehow asserted against the Locust Club" is "beyond frivolous."  (Dkt. 34 at 10).

To the extent that Plaintiff now purports to have alleged a claim against the Locust Club for abuse of process, any such claim is dismissed because it is based on vague, conclusory assertions that lack plausibility.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted); *see also Hilliard*, 2011 WL 7101236, at *12 (dismissing claim with prejudice against defendants whom plaintiffs failed to mention in their allegations related to that cause of action).  And to the extent that Plaintiff seeks to amend his complaint to allege an abuse of process claim against the Locust Club through his response papers, he cannot do so.  *See, e.g., Oasis Capital, LLC v. Connexa Sports Techs. Inc.*, No. 23 Civ. 1038 (LLS), 2023 WL 4304725, at *6 (S.D.N.Y. June 30, 2023) ("Claims not included in the Amended Complaint cannot be argued for the first time in an opposition to a motion to dismiss."); *Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 526-27 (S.D.N.Y. 2015) ("a complaint cannot be amended merely by raising new facts and theories in a plaintiff's opposition papers" (alterations and citation omitted and collecting cases)).

### E.     Eighth Cause of Action: Fraudulent Misrepresentation

Plaintiff alleges that the Locust Club fraudulently told him that "if he agreed to [a] 'tentative resignation,' his employment status would be reviewed by the new chief coming in and renegotiated."  (Dkt. 16 at ¶ 139).  Plaintiff also alleges that the Locust Club took steps to ensure he could not get another job as a police officer as part of this cause of action.

(*Id.* at ¶ 140).  The Locust Club argues: (1) Plaintiff is merely restating his time-barred breach of duty of fair representation claim under the guise of a different cause of action; (2) Plaintiff's allegations are not sufficiently detailed as required under the heightened pleading requirements for a fraud claim; (3) Plaintiff has not alleged a material false misrepresentation or fraudulent intent; and (4) even if Plaintiff has made sufficiently detailed allegations of a material false misrepresentation and fraudulent intent, his reliance on any misrepresentation was not justified.  (*See* Dkt. 21-5 at 10-16).

Under New York law, a fraudulent misrepresentation claim requires a plaintiff to allege "that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Kakarla v. Penakalapati*, 551 F. Supp. 3d 70, 81 (W.D.N.Y. 2021) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004)).  Federal Rule of Civil Procedure 9(b) establishes a heightened pleading standard for fraud allegations: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

The plain language of "Rule 9(b) permits '[m]alice, intent, [and] knowledge' to be averred generally."  *In re Agape Litig.*, 773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011) (alterations in original) (quoting Fed. R. Civ. P. 9(b)).  "However, because courts 'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . .

plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Id.* at 307-08 (alterations in original and quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)); *see also Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5354 KAM RLM, 2014 WL 1311979, at *7 (E.D.N.Y. Mar. 28, 2014) ("With respect to claims of fraudulent misrepresentation and fraudulent concealment, Rule 9(b) requires a plaintiff to allege facts that give rise to a strong inference of fraudulent intent." (quotation omitted)).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Plaintiff has identified a single purported materially false representation by the Locust Club.  At the time of his disciplinary hearing on August 23, 2021, Plaintiff claims that Mazzeo stated: "[Plaintiff] was being offered a 'tentative resignation' and that he would stay on 'Q time' and when the current RPD Chief left, which was estimated by Mazzeo to be October of that year, negotiations would continue and [Plaintiff] could continue working at RPD."  (*See* Dkt. 16 at ¶ 55).  As an initial matter, to the extent this statement by Mazzeo was a representation that the Locust Club would attempt to secure Plaintiff's rehiring by RPD when a new chief was hired, Plaintiff has not plausibly alleged that it was false.  To the contrary, Plaintiff affirmatively alleges that in November of 2021—around the time David Smith became the new RPD chief and before Plaintiff resigned from RPD on December 1, 2021—Mazzeo told him that he was "trying to negotiate Q time and

tentative resignation until we can negotiate with the new chief" but "they aren't budging." (*Id.* at ¶¶ 60, 62). In other words, Plaintiff's own allegations are that he was told <u>before</u> he resigned in December of 2021 that the Locust Club's attempts to negotiate a "tentative resignation" were ongoing.

Moreover, even assuming Mazzeo's statement has been plausibly alleged to have been false, Plaintiff has not alleged "facts that give rise to a strong inference" of fraudulent intent. *In re Agape Litig.*, 773 F. Supp. 2d at 307-08. At no point does Plaintiff allege that Mazzeo negotiated Plaintiff's resignation from RPD with the knowledge that the City would not rehire him, nor does he allege facts supporting the inference that Mazzeo did not, at the time he made the statement, intend to continue negotiating and to secure Plaintiff's rehiring.[10] Nor does Plaintiff allege that the Locust Club had any motive to perpetrate a fraud upon him. Further, Plaintiff's conclusory allegation that "Defendants . . . took steps to make sure that he never worked as, not only a RPD Officer, but a police officer in general" (Dkt. 16 at ¶ 140) alleges no specific action by Mazzeo or the Locust Club, and provides no support for a finding of fraudulent intent.

To the extent Plaintiff is claiming that Mazzeo falsely promised on August 23, 2021, that he would be rehired by RPD when a new chief came on board, again, Plaintiff acknowledges that Mazzeo also said in the same conversation that "negotiations would

---

[10]     Plaintiff does allege that on July 14, 2021, Mazzeo sent emails to an unspecified recipient stating, "I am not using this as an excuse to save someone's job" and "your offer to resign is more than fair." (Dkt. 16 at ¶ 50). These contextless statements provide no meaningful information from which to infer Mazzeo's state of mind. It is not clear what the "this" is that Mazzeo will use as "an excuse to save someone's job," nor is it clear who has made an offer to resign or what the terms of that offer were.

continue." (*Id.* at ¶ 55).   Three months later (before Plaintiff resigned from RPD on December 1, 2021), Mazzeo texted Plaintiff to inform him that negotiations were ongoing, but were not going well.  (*See id. at* ¶ 62) ("Look Adam, they aren't budging, this is what we got, we are trying to negotiate Q time and tentative resignation until we can negotiate with the next chief[.]").  Allegations that Mazzeo was overly confident about the success of the Locust Club's negotiations with the incoming RPD chief fall far short of plausibly alleging any fraudulent intent by the Locust Club.  Plaintiff has not satisfied the Rule 9(b) pleading standard, and his fraudulent misrepresentation claim must be dismissed.

### F.     Ninth Cause of Action: Conversion

Plaintiff does not identify against which defendants his claim for conversion is directed.  (*See id.* at ¶¶ 142-45).  The Locust Club argues that this cause of action is against only the City based on the nature of the claim, but that to the extent Plaintiff is alleging it against the union, the claim must be dismissed because he fails to allege that he ever owned, possessed, or controlled the "retroactive pay and COVID pay" to which he purportedly was entitled based on his employment with RPD.  (Dkt. 21-5 at 16-17).

To state a claim for conversion under New York law, "the plaintiff must allege that (1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused."  *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 133 (2d Cir. 2022) (citation omitted); *see Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) ("[C]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to

another to the exclusion of the owner's rights." (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)).  When the property is money, "it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." *Coughlan v. Jachney*, 473. F. Supp. 3d 166, 200 (E.D.N.Y. 2020) (citation omitted).  "[A] conversion claim for money only survives if plaintiff had 'ownership, possession or control of the money' prior to the conversion[.]" *Shetel Indus. LLC v. Adin Dental Implant Sys., Inc.*, 493 F. Supp. 3d 64, 123 (E.D.N.Y. 2020) (alteration in original and citation omitted).  A plaintiff merely seeking to enforce an obligation to be paid is not sufficient.  *See id; Ehrlich v. Howe*, 848 F. Supp. 482, 492 (S.D.N.Y. 1994) (collecting cases).

Here, Plaintiff cannot point to the specifically identifiable funds at issue because by his own admission, he "never received" the retroactive pay that he seeks.  (*See* Dkt. 16 at ¶ 144).  He attempts to equate his alleged "vested" interest in the pay with "ownership, possession or control of the money" prior to the conversion, but this is misguided because he is merely seeking to enforce the City's alleged obligation to retroactively pay him under an unspecified "prior contract."  (*See* Dkt. 33 at 4).  Because Plaintiff has not sufficiently alleged a cause of action for conversion, his claim is dismissed.  *See Fleurentin v. McDowell*, No. 05-CV-4274ARRCLP, 2009 WL 2969686, at *7 (E.D.N.Y. Sept. 16, 2009) (dismissing conversion claim over funds that were only "a general debt to plaintiff" and not "specific money from an identifiable fund which defendants had an obligation to treat in a particular way"); *Ehrlich*, 848 F. Supp. at 492 (dismissing claim for deferred compensation as "insufficient as a matter of law unless it is alleged that the money

converted was in specific tangible funds of which claimant was the owner and entitled to immediate possession").

In addition, the Locust Club is an inappropriate defendant for Plaintiff's conversion claim, which is plainly directed at the City, his former employer. Plaintiff has not alleged that the Locust Club exercised dominion over or ownership of the retroactive pay to which he claims entitlement. *See V&A Collection*, 46 F.4th at 133. On that basis as well, Plaintiff's conversion cause of action against the Locust Club is dismissed.

In sum, Plaintiff has failed to state any claims against the Locust Club upon which relief can be granted, and the Locust Club's motion to dismiss is granted.

## III.   The City's Motion to Dismiss

The Court next turns to the City's motion to dismiss. (Dkt. 26). The City interprets the second amended complaint as alleging all causes of action against it, except for the breach of duty of fair representation, and Plaintiff does not disagree. (*See* Dkt. 26-4 at 2-3; Dkt. 32 at 2-4). The Court will first consider claims that the City argues were waived under the Settlement Agreement, including the NYSHRL claim, the Title VII claim, and the claims for violation of due process and breach of contract, retaliatory action by a public employee pursuant to New York Civil Service Law § 75-b, constructive termination or discharge, and fraudulent misrepresentation. The Court will separately consider Plaintiff's claims against the City for abuse of process and conversion.

### A.   Consideration of the Settlement Agreement on a Motion to Dismiss

The gravamen of the City's motion to dismiss hinges on the enforceability of the Settlement Agreement that Plaintiff and the City signed on September 14, 2021. (*See* Dkt.

- 27 -

26-4 at 3-4).[11]   The Court first addresses whether the Settlement Agreement can be considered at this stage of the proceedings.  "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  "A document is incorporated by reference if the complaint makes, a clear, definite and substantial reference to the document."  *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 608 (E.D.N.Y. 2017) (quotation and alteration omitted).  For example, where a complaint "explicitly refers to and relies upon" documents outside of the complaint, those documents are incorporated by reference.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

Moreover, even if a document is not incorporated by reference in the complaint, "the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  *DiFolco*, 622 F.3d at 111 (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  "[A] contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls" is generally deemed integral to the complaint, and accordingly may typically be considered on a motion to dismiss.  *Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006); *see Barker v. Bancorp, Inc.*, No. 21 Civ. 869 (KPF), 2022 WL 595954, at *6 (S.D.N.Y. Feb. 25, 2022) ("The Second Circuit has

---

[11]     Both the Locust Club and the City attached the Settlement Agreement to their motions to dismiss.  (*See* Dkt. 21-3; Dkt. 26-2).

cautioned district judges to be mindful of litigants who cherry-pick among relevant documents, and has clarified that district courts may consider relevant documents that are fairly implicated by a plaintiff's claims, irrespective of whether they are part of the pleadings."). However, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that there are "no material disputed issues of fact" about its relevance before a court can consider the document in connection with a Rule 12(b)(6) motion. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, the Settlement Agreement is incorporated by reference since the second amended complaint makes a clear, definite, and substantial reference to the document. (*See* Dkt. 16 at ¶¶ 56-59, 133). The Settlement Agreement is also integral to the complaint because the second amended complaint stands or falls on its applicability to the allegations against the City. Plaintiff indisputably had notice of the Settlement Agreement because he signed it (Dkt. 26-2 at 5) and references it in the second amended complaint, alleging that on September 14, 2021, he signed "papers that constructively terminated him but under the guise of resignation" (Dkt. 16 at ¶ 59). In opposing the instant motion, Plaintiff argues that the Settlement Agreement is unenforceable, but he does not dispute the authenticity or accuracy of the document, or raise a material disputed issue of fact about its relevance. (*See* Dkt. 32 at 2-3).[12] Therefore, Plaintiff cannot "forestall[] the district court's decision

---

[12]     Indeed, Plaintiff, in responding to the Locust Club's motion to dismiss, admits that Docket 21-3 is "a copy of the Settlement Agreement between the City and plaintiff." (*See* Dkt. 31 at ¶ 5). In responding to the City's motion to dismiss, Plaintiff denies that "[t]he Plaintiff's resignation was part of Settlement Agreement, dated September 14, 2021, to

on a [12(b)(6)] motion" by omitting the Settlement Agreement.  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (alteration in original).  The Court will consider the Settlement Agreement in its assessment of the City's motion to dismiss.

### B.      Enforceability of the Settlement Agreement

Having established that the Court may consider the Settlement Agreement in evaluating the instant motion, the Court turns to the document's enforceability with respect to Plaintiff's causes of action against the City.  The City argues that the Settlement Agreement requires dismissal of all causes of action asserted against it, except the claim for abuse of process (the seventh cause of action).  (*See* Dkt. 26-4 at 6).  Plaintiff argues that the Settlement Agreement is unenforceable because he did not "knowingly and voluntarily" waive claims against the City.  (*See* Dkt. 32 at 2-3).

"[F]ederal courts have articulated a strong policy in favor of enforcing settlement agreements and releases."  *Barshay v. Naithani*, No. 20 Civ. 8579 (KPF), 2023 WL 2051170, at *8 (S.D.N.Y. Feb. 16, 2023) (quotation omitted), *aff'd*, No. 23-382, 2023 WL 8708424 (2d Cir. Dec. 18, 2023).  In applying a release to federal discrimination claims, "the Court must [] find that the employee's waiver was 'knowing and voluntary' under the totality of the circumstances."  *Pucilowski v. Spotify USA, Inc.*, No. 21 Civ. 1653 (ER), 2022 WL 836797, at *4 (S.D.N.Y. Mar. 21, 2022) (quoting *Bormann v. AT&T Commc'ns,*

---

fully and finally resolve disciplinary charges, after Plaintiff exercised his right to a Civil Service Law §75 hearing.  [Dkt. 26-2]."  (*Id.* at ¶ 10).  The Court interprets these declarations from Plaintiff's attorney as admitting that the attached documents are the Settlement Agreement, but that Plaintiff disputes the ramifications of the agreement, as described by the City, consistent with Plaintiff's argument that it is unenforceable.

*Inc.*, 875 F.2d 399, 400-03 (2d Cir. 1989)), *aff'd*, No. 22-869-cv, 2022 WL 16842926 (2d Cir. Nov. 10, 2022).

The factors outlined in *Bormann* guide a court's analysis of whether a release of federal discrimination claims was knowing and voluntary:

> (1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.

*Id.* at *4 (quoting *Bormann*, 875 F.2d at 403)*.*  "In addition, courts have considered a seventh factor—whether the employer encouraged or discouraged an employee to consult an attorney and whether the employee had a fair opportunity to do so." *Id.*  Evaluating "the validity of a release is a peculiarly fact-sensitive inquiry." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437-38 (2d Cir. 1998).  "[T]he *Bormann* analysis departs from ordinary contract principles and imposes a more rigorous and subjective voluntariness test in deference to the strong Congressional purpose to eradicate discrimination in employment." *Mandavia v. Columbia Univ.*, No. 12 Civ. 2188 (JPO), 2013 WL 2391695, at *5 (S.D.N.Y. June 3, 2013) (quotations and alteration omitted), *aff'd*, 556 App'x 56 (2d Cir. 2014).

The City offers no argument as to why Plaintiff knowingly and voluntarily waived his claims against it when he signed the Settlement Agreement, other than the fact that the document said so.  (*See* Dkt. 35 at ¶¶ 8, 10).  The City does not even mention the *Bormann* factors or how the totality of the circumstances weigh in favor of enforcing the agreement.

The two cases that the City cites in support of its argument that Plaintiff has waived his claims are inapposite.  (*See* Dkt. 26-4 at 6-7).  In *New York State Teamsters Conference Pension and Retirement Fund v. Tops Markets, LLC*, No. 17-CV-451V(F), 2018 WL 11354529 (W.D.N.Y. Mar. 26, 2018), the parties disputed whether an on-the-record settlement released all claims, which is not a question in this action.  *See id.* at *10-11.  In *Morefun Co. Ltd. v. Mario Badescu Skin Care Inc.*, No. 13 Civ. 9036 (LGS), 2014 WL 2560608 (S.D.N.Y. June 6, 2014), *aff'd*, 588 F. App'x 54 (2d Cir. 2014), the plaintiff brought a claim for fraudulent inducement as the vehicle to challenge the validity of a settlement agreement, which the court dismissed because a party cannot bring a fraudulent inducement claim when the alleged fraud is the release of claims in a settlement agreement. *See id.* at *4, 6.  To the extent that this case has any applicability to the instant action, it may be relevant to Plaintiff's fraudulent misrepresentation cause of action, but the City has made no such argument.

Furthermore, according to *Morefun*, "[w]hile the defendant has the initial burden of showing that it has been released from claims, 'a signed release shifts the burden of going forward to the plaintiff to show that there has been fraud, duress, or some other fact which will be sufficient to void the release.'"  *Id.* at *4 (quotation omitted).  Plaintiff alleges that he signed the Settlement Agreement "under duress," without the assistance of an attorney, and after being told that he would be fired "on the spot" if he did not sign.  (*See* Dkt. 16 at ¶¶ 56-59).  The City, which has the burden of demonstrating the insufficiency of Plaintiff's claims, has not meaningfully addressed these allegations.  In other words, the City may ultimately be correct that the Settlement Agreement bars Plaintiff's claims, but it is not the

Court's job to appropriately articulate arguments in support of that conclusion. The City was required to do so, and it wholly failed to meet its burden with the pending motion. Accordingly, the City's motion to dismiss must be denied with regard to the NYSHRL claim, the Title VII claim, and the claims for violation of due process and breach of contract, retaliatory action by a public employee pursuant to New York Civil Service Law § 75-b, constructive termination or discharge, and fraudulent misrepresentation.

### C.   Plaintiff's Claim Against the City for Abuse of Process

Plaintiff's abuse of process claim is asserted against the City in the second amended complaint for its alleged retaliatory actions after Plaintiff filed his complaint with the New York State Division of Human Rights, after he signed the Settlement Agreement and resigned from RPD. (*See* Dkt. 16 at ¶¶ 66-75, 134-36). Plaintiff contends in his motion response that this claim also entails the following actions by the City before he resigned:

> [B]rought disciplinary proceedings against Plaintiff and issued a Stay Away Order against Plaintiff for speaking up about unaddressed misconduct in the Department while Plaintiff was the victim of domestic violence (and where the charges were "unprovable"), refused to provide him an attorney during the proceedings (despite telling him he would receive one), had Plaintiff "tentatively resign" under the pressure of the proceedings that were brought solely for his whistleblowing, knowing Plaintiff did not understand that he was being permanently terminated[.]

(Dkt. 32 at 3-4). The City argues that the Settlement Agreement is a defense to the abuse of process claim and that Plaintiff has failed to allege a plausible cause of action based on alleged actions that the City took after he resigned. (*See* Dkt. 26-4 at 7-8).

As an initial matter, for the reasons stated above as to why the City's motion to dismiss cannot be granted for claims ostensibly waived pursuant to the Settlement

Agreement, so too does the City's argument fail on this basis for the abuse of process claim. In other words, because the enforceability of the Settlement Agreement has not been established at this stage of the proceedings, the City cannot rely on the Settlement Agreement to defeat Plaintiff's abuse of process claim.

Furthermore, the City's argument that Plaintiff has failed to allege an abuse of process is insufficient.  The City merely lists the elements of this cause of action and offers one additional sentence: "Nothing described in the Amended Complaint comes near to the required elements and the Seventh Cause of Action must be dismissed."  (*Id.*).  The City does not even address Plaintiff's argument that his abuse of process claim applies to alleged events that occurred before he resigned from RPD.  Whatever deficiencies there may be in Plaintiff's abuse of process claim, the City has not borne its burden under Rule 12(b)(6) to demonstrate them.  *See, e.g., Stephens Inc. v. Flexiti Fin. Inc.*, No. 18-CV-8185 (JPO), 2019 WL 2725627, at *7 (S.D.N.Y. July 1, 2019) ("[T]he moving party . . . has the burden of demonstrating its entitlement to relief under Rule 12(b)(6).").

### D.    Plaintiff's Claim Against the City for Conversion

Plaintiff demands "retroactive pay and COVID pay" based on his RPD employment that was subject to an unspecified "prior contract."  (*See* Dkt. 16 at ¶¶ 144-45).  The City only argues that the Settlement Agreement precludes this cause of action.  (*See* Dkt. 26-4 at 3).  However, the Court has already concluded in connection with the Locust Club's motion to dismiss that this claim fails as a legal matter.  The conversion claim against the City is based on the exact same factual allegations as the conversion claim against the Locust Club.

The Court may dismiss "a complaint *sua sponte* for failure to state a claim so long as the plaintiff is given notice and an opportunity to be heard." *Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) (internal quotation marks and citations omitted), *abrogated on unrelated grounds by Florence v. Bd. of Chosen Freeholders of Burlington Cty.*, 566 U.S. 318 (2012).   In particular, where one defendant has argued that a claim is legally insufficient and the plaintiff has had notice and an opportunity to respond to that argument, the Court may *sua sponte* dismiss the same claim as to other defendants.  *See, e.g., Semple v. Eyeblaster, Inc.*, No. 08 CIV. 9004(HB), 2009 WL 1457163, at *1 n.1 (S.D.N.Y. May 26, 2009); *In re Parmalat Secs. Litig.*, 377 F.Supp.2d 390, 415 n.166 (S.D.N.Y. 2005).  Plaintiff's conversion claim fails as to the City for the same legal reason it fails as to the Locust Club—because he acknowledges that he did not receive the retroactive pay that he seeks, and so the money is not "specifically identifiable" and "subject to an obligation to be returned or to be otherwise treated in a particular manner." *See Coughlan*, 473. F. Supp. 3d at 200; *Shetel Indus.*, 493 F. Supp. 3d at 123.  The Court will accordingly dismiss the conversion claim against the City, as well.

In sum, of the eight causes of action that Plaintiff has alleged against the City, the conversion claim is dismissed *sua sponte* for legal insufficiency.  The City has not borne its burden of demonstrating that the abuse of process claim is inadequately pled, and it will not be dismissed at this time.  The City's argument that Plaintiff's other claims are precluded by the Settlement Agreement is insufficient at this stage of the proceedings to warrant dismissal because the City failed to meaningfully address Plaintiff's contention that he did not knowingly and voluntarily waive his claims against the City.

## **CONCLUSION**

For the foregoing reasons, the Locust Club's motion to dismiss (Dkt. 22) is granted.

The City of Rochester's motion to dismiss (Dkt. 26) is granted in part and denied in part.

Specifically, the City's motion is granted with respect to Plaintiff's conversion claim, and

to the extent that RPD is terminated as a defendant.  The City's motion is denied with

respect to all other claims asserted against it.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: March 19, 2024
       Rochester, New York

- 36 -